The next case for argument is 164574, Northern District of Iowa, East Iowa Plastics, Inc. v. PI, Inc. Ms. Oxley, when you're ready. May it please the Court. We're here for the second time to determine whether East Iowa Plastics, EIP, is entitled to attorney's fees in its trademark litigation against PI. This Court previously reversed the $585,000 award from the District Court under the Lanham Act on the basis that EIP was not a prevailing party under that statute. The Court issued a very specific remand. This Court said that there were two facts that were unanswered by the District Court's prior ruling. First, whether or not, and it related to ownership of the trademark. First, whether or not PI was a joint owner or was a licensee, and then, if a licensee, the extent of that license. The Court directed the District Court to consider whether the answer to those questions would entitle EIP to attorney's fees under state law based on ownership of the trademark. This Court, in its prior ruling, as well held that EIP identified no harm, even when given a second chance to re-brief the issue, that EIP suffered related to PI's receipt of a registered trademark. To the point that EIP even lacked standing to challenge that registration. And this Court reversed the District Court's cancellation of PI's registered trademarks. Against that backdrop, the District Court, on remand, awarded EIP $400,000 under state law for its attorney fees. Even though the District Court expressly recognized that its remand was limited to state court versus state law, it attempted also to reaffirm its prior $585,000 award under the Lanham Act. EIP attempts to hold on to that $585,000 award, which reminds me a little bit of a saying a judge I know uses, greedy, greedy makes a hungry puppy. To the extent that EIP seeks to hold on to the Lanham Act award, the Federal Declaratory Judgment Act itself does not support an award of fees. There must be an underlying statute. And the only statute here is the Lanham Act, which this court has already said does not support a fees to EIP. Unless the court has questions for me related to the $585,000 award. I would like to focus now- Also barred by the law of the case, isn't it? Exactly. So turning to the state court award, or the state law award, Iowa applies the American Rule, which requires parties to incur their own attorney's fees, unless a contract or a statute declares otherwise. None exists here, and both EIP and the District Court relied on the common law exception to the American Rule. The Supreme Court and Alieska Pipeline noted this exception, but in doing so, they also noted it was important to apply the public policy of the state when considering an award under state law. In the Hockenberg case, the Iowa Supreme Court clarified its version of the common law attorney's fees. It made very clear that the exception was what it called, quote, rare. It's a much higher standard than what Alieska represented. It's even higher than what's required for punitive damages. So wanton and willful disregard for the rights of another does not meet the threshold for considering common law fees. It expressly requires connivance or oppression, which the Iowa Supreme Court defines as intentional conduct that includes, excuse me, is aggravated by conniving or tyrannical behavior. The case law, they use the phrase bad faith as well, right? And there's also an or in some of the case law. That's your position that the connivance is really the premier guidance that we have under Iowa law? Exactly, and I think the Iowa Supreme Court made that clear just last May in the Thornton case that we, I think we gave the court a 28-J letter on that case that said specifically bad faith is not enough. And in that case, the Iowa Supreme Court also reaffirmed that the standard or the threshold is indeed very difficult to reach under Iowa law. And one of the district court made some findings on the, I guess, the actions of the attorney and the client in terms of connivance to try to sort of do a, I don't know, tag team to try to avoid any kind of liability for what they were doing. Is there anything in the record to base that? Are there basic pieces of evidence in the record that would support that inference? There really is not. The only thing that EIP was able to point to was the fact that Pi's Chicago attorney emailed a copy of the application where he had filled out the declaration to Pi. But that email came after the application had already been filed. If you're going to have connivance, that's got to happen ahead of time. The district court also tried to tie Pi's actions in receiving the trademark to connivance against EIP by first saying, well, Pi learned that EIP's trademark, federal registered trademark, had lapsed. EIP never had a registered trademark. When EIP bought its product line from Kintec under the asset purchase agreement, Phillips, which was Kintec's predecessor, had a registered trademark for Paxter. EIP never transferred that registration in the Patent and Trademark Office to itself. And so when Pi, there is evidence that Pi actually did look in the Trademark Office to see whether or not there was a registered trademark, and all they saw was that the Phillips mark had lapsed. Well, Phillips is who sold the products to Kintec, and that's who Pi bought their molds from. So when Pi saw that the Phillips trademark had lapsed, it would have had no way to know that EIP thought that it had a registered trademark. And then related to that, these two parties coexisted for a good 10 years. They attended the same trade shows. They very clearly knew about each other's marks. But EIP never told Pi that it thought that EIP owned the mark and that Pi was subject only to a license. That didn't, Pi was not even aware that EIP had an asset purchase agreement, or specifically the license agreement, until 2012 after EIP, or after Pi had sent its first cease and desist letter. Is the interaction between Pi and the Patent and Trade Office, is that relevant in the inquiry of connivance? No, to the inquiry of connivance. It seems, maybe the way I read the district court, it seems that perhaps that, to the extent that the district court felt that Pi was pulling one over on the Patent and Trade Office, that that could be a fact that might justify attorney fees. And I think that that brings us back to the purpose of the remand, which was to determine whether the finding of ownership of the trademark would support attorney's fees. Under state law and under trademark law in general, a registered trademark has nothing to do with ownership. Ownership, in this case, was based on the asset purchase agreement, but also on use. You can ask for a registered trademark from the Patent Office, but if you don't use the trademark, then you don't own it. So the registration just has nothing to do with ownership. But I think that does bring back to a good point. The district court, in its first order on remand, really made clear that its concern was that Pi shouldn't be able to benefit from its fraud on the Patent Office, as opposed to anything related to EIP. The court said, quote, justice is denied if the defendant is allowed to use the trademarks that were the fruit of its fraud. That's really what was driving the district court's decision. But again, when you look at the Iowa courts, the Iowa cases that apply the common law fee exception to the American rule under Iowa law, fraud simply is not enough. That's clear in Hockenberg. It's clear in Wolfe. It's clear in Schaefer, I believe, is the one involving the father who defrauded a bank. And he convinced his sons to sign personal guarantees on the loans. And the court said defraud on the bank was not enough to support common law fees. In that particular case, the fact that the father was willing to throw his own sons under the bus did support common law fees. But that's the point, is that that separate relationship existed. And here that just doesn't exist. Subsequent cases, including Wolfe and Kritzer, show that fraud itself just isn't enough to support common law fees under Iowa law. Part of the connivance finding related to the timing of the cease and desist letters. Right. And I think the district court found that they were sent after the trademark became uncontestable. Right. Your argument is that's factually wrong? Right. And EIP does not even attempt to support that fact. Really, the incontestability, the five-year incontestability, was the linchpin of the district court's finding of connivance. He said they connived with their attorneys to get a registered trademark. They laid in wait for five years for it to become incontestable. And then they started sending these cease and desist letters. They received the first, PI received its first federal registration in December of 2007. So the trademark turned out to become incontestable in December 2012. And they sent the first cease and desist letter in January of 2012. And then they even negotiated with EIP for nearly a year, trying to decide if one should buy out the other. And at the end of that, when neither one of them decided they wanted to buy the other one, that's when EIP then sued PI. I really think that Hockenberg, this case is just indistinguishable from Hockenberg. I think the important things from Hockenberg are, even though the district court in that case found that the defendant's actions were directed specifically at the plaintiff, in this case, the prior panel, which is law of the case, found that PI's actions were not directed at EIP in any way, to the point that EIP didn't even have standing to challenge the registration. And in Hockenberg, the defendant disregarded and ignored district court orders to stop, but it continued sending its marketing material to the plaintiff's own customers using the plaintiff's trademark. Much more egregious actions here. And the plaintiff had to sue the defendant twice. EIP says, well, we were harmed and we were forced to bring suit. In Hockenberg, that plaintiff had to sue that defendant twice and actually get an injunction to stop the defendant who ignored the injunction at first. But in that case, the Supreme Court said, that supports punitive damages, but it reversed common lobbies. And that was, Hockenberg has been followed consistently by the Iowa courts. And so I think it's important for this court, especially when we're looking at state law, to be deferential to Hockenberg and apply that standard. I hate to get into your rebuttal, but I would like you to address the restriction on the license back, if you could. Because it seems like no one's disputing the actual ownership. It's just the scope of the license back. Exactly. And so the license, when EIP purchased the trademark along with the business from Kintec, Kintec reserved for itself an exclusive, perpetual, absolute license to use it for injection molded products. Because it told EIP, we're going out of business. We're selling our separate line that's out of our Tennessee office, or Kentucky office, to someone else. And we want to be able to let them use the Paxtra mark. And that was the whole reason they even had the license agreement to begin with. And so the district court erred in, first it found that there was an implied license, but that actually was an express license. That license was attached to the asset purchase agreement. It was very clear what was being, what Kintec withheld for itself, and what that license covered. What might be inferred is what Kintec gave to PAI. But all of the actions of all the parties in this case, including Kintec and EIP, when they entered into the asset purchase agreement, and including EIP and PAI, when they went forward in operating each of their individual businesses, recognized that distinction between the thermoformed products that EIP bought from Kintec versus the injection molded products that PAI bought. And that's been the distinction throughout the course of the litigation. It really was. And so at a minimum, PAI should get to continue using the Paxtra mark under the license, which again is perpetual and irrevocable, on at least those products that it was producing at the time that EIP sued it. And that's what your request, that's the products that were actually being manufactured, and by narrowing it to the egg flats, that's where you're asserting that the district court erred. Exactly. And there just is, again, EIP does not even attempt to support that finding by the district court. At the time that PAI bought molds, there was more than just an egg flat. It bought two other molds as well at that same time. And those are the three that eggs they're wanting to use.  I'd like to reserve the rest for rebuttal. Thank you. Very well. Thank you. Good morning, Your Honors, and may it please the Court. My name is Glenn Johnson. I represent East Iowa Plastics in this case. Now, first of all, before I get into my argument, let me address a couple questions that were raised by this Court. Number one, when the molds were purchased by PAI, they bought molds for two products and two products only, chicken coops and egg baskets. The testimony of Robert Johnson made that crystal clear in the record. There were no egg flat molds that were purchased. And, in fact, Robert Johnson testified that the egg flat mold that ultimately was introduced under the Paxter brand by PAI is one they copied from a competitor, Kewl Enterprises, and introduced it into the marketplace. So what is your position? So you're starting with the second issue of the license back. What is your position on the scope of that license back? Am I correct that everybody agrees of the ownership, but it's just the scope of that license back to PAI? Well, first of all, Your Honor, on the ownership issue, very briefly, PI contested hotly the issue of ownership all the way through trial of this particular case. They contested it in two specific ways. Number one, that my client, East Iowa Plastics, held no ownership rights under the asset purchase agreement. And, therefore, under their, if one would read their registrations and the scope of the goods covered by their registration, EIP would have been infringing. Now, they dropped right before trial their counterclaims of infringement against us for tactical reasons. But the essence of their position all the way through trial was that EIP held no ownership rights whatsoever in this trademark. All right? Secondly, they claimed that they held ownership rights in this trademark all the way through trial.  What number one is, is that they used the mark in commerce, and they solidified the use of the mark in commerce by registrations lawfully obtained from the United States Patent and Trademark Office. So they claimed that these registrations were lawful. They maintained that position all the way through trial. Now, part of that claim of lawfulness was that they enjoyed the legal presumptive benefit of validity of their ownership of the trademarks, of the right of exclusivity of the right of the trademarks. And the bottom line is, is that they doggedly maintained this position all the way through trial. They lost the issue. All right? So now they're here saying, well, we're a licensee. We should be entitled to use this to the full breadth and extent that we, under the license that was granted back to Kentec. The essence of their position is that they now should be allowed to step in and use the written license that was given by EIP to Kentec, when throughout trial they absolutely, unequivocally denied that they were a licensee. They absolutely, unequivocally denied that that license was applicable to them. So it's your position that they're not a licensee? What is your position on that second issue? Judge, our position is this. This case is not limited to ownership. This case is about the application of the regulatory scheme of trademark law that's embodied in the Lanham Act. All right? Now, if you look at the Lanham Act, and if you look at the history and basis for trademarks, the consuming public is a driving force with regard to trademarks. And the essence of trademark law is that the consuming public should be protected from confusion. All right? In this particular case, confusion was rampant, and that was before the judge. So what he did, the Lanham Act affords, statutorily affords, the court equitable authority and power to fashion remedies that address consumer confusion and that are fair to all. For example, in the case before the judge, under Section 1117, the judge found that, essentially, that East Iowa Plastics had not proven loss of sales, and therefore there was no monetary damage. The judge made it crystal clear in the remand rulings that he didn't find monetary damages. Well, if you look at Section 1117, it says that monetary damages are applicable only in the interest of equity. There's an equitable filter through which this goes. The judge determined that there was no equity for that. The judge also had the authority to grant an equitable license in this particular case, and the judge did that. The ruling makes clear that he found that there was an implied license, number one, not a written license, not an assignment of a written license, and that's supported by the record. Number two is that the implied license was based upon the fact that there was embedded in one mold the name Paxter, and we've addressed that to the court. So the long and the short of it is he said, look, there's an implied license that they can use the Paxter mark limited to the mold in which the mark was located when they purchased the molds. Now, Your Honors, we have testimony from both Mr. Johnson and from Austin Tyner. I'm sorry, I couldn't remember his name. So we have testimony from Robert Johnson and Austin Tyner who were both involved in the acquisition of these molds, and essentially the gist of that testimony is that there was no discussion, there was no care on the part of PI with regard to the Paxter trademark, none. And, in fact, what they were interested in was the molds. Now, there's an argument here that, oh, that they bought this line of business and those sorts of things. No, they didn't. They bought two molds, and that's what the essence of this testimony is. My client, East Iowa Plastics, bought an entire line of business. When my client was offered this opportunity, the initial contract provided by Kentec, which is a company, by the way, that Austin Tyner testified, was on sale, sold $30 million plus per year. It is not an unsophisticated entity. There was no offer of trademark ownership. My client negotiated the purchase of the entire trademark. The only thing that happened is Kentec had two molds that they were making products with that they were trying to unload, and they wanted to be able to sell those products and sell them under the Paxter mark, so they retained the right to use this Paxter mark. There is nothing in the record that shows that they assigned that right on to P.I. There's nothing in the record that shows that P.I. asked them. The record is clear that P.I. denied that they ever received those trademark rights. So what the judge found is because of the fact of that embedded mark, that they acquired an implied limited license agreement under the authority of equity under the trademark law. So that was part of the regulatory schema because if you look at that in conjunction with the ownership issue, the judge basically has now imposed the regulatory scheme that is anticipated and fostered by the Lanham Act. That regulatory scheme is that there has to be a party responsible to control consumer confusion. Can we talk about the attorney's fees for a minute? Sure. The Lanham Act finding, wasn't that beyond the scope of the mandate of this court on remand? I don't think it was, Your Honor. I think if you look at what the ruling is, I read the remand of this court, and of course at the end of the day is this court is the best one to determine what the scope of the remand is. So I appreciate that. I thought it limited it to attorney's fees under state law. I don't think it did. I said it returned, among other things, I believe the case said that we argued that we were entitled to attorney's fees because we prevailed in the declaratory judgment act. It returned that issue to the trial court for determination. It did state that there was an issue of ownership is generally a state law issue. But it didn't restrict the remand, in my view. It did cite some cases which, among other things, were referenced, I believe, by a P.I. that basically said that the ownership issue is a state law claim and that there's no jurisdiction if you wrap, if essentially the federal claim is strictly a veneer covering the state law claim. Well, here there was no veneer. Here there was a regulatory problem under the Lanham Act. We had unfettered confusion. If you look at this court's decisions and you look at the definition of infringement, the B&B hardware case says that there are two elements of infringement. First, there has to be an owner of a valid trademark. Secondly, there has to be a likelihood of consumer confusion. The likelihood of consumer confusion was throughout the record. It was unchallenged. So here with the ownership issue being determined, the two elements for infringement existed as a matter of record. If we could shift just a little bit to the alternative grounds that the district court gave on the state law exception for attorney fees, what are the best two or three facts that are supportable in the record that meet this standard under the Iowa law? Well, I think the best two or three facts are, number one, that there was a concerted effort by P.I. not only to take the trademark but to steal away the business of Eastern Iowa Plastics. The record is replete with these activities. There was an order by a vice president of the company to knock off, that is, copy one of East Iowa Plastics' products. Now, they tried to justify this as, well, that's okay. But if you take that in combination with their efforts to try and leverage away our trademark, well known in the industry and branded, that is abusive. So that's one particular fact. Secondly, we have fraud that was practiced here, and the fraud carried into the courtroom. In other words, they continued to maintain that what they did was proper, and it was not. And so that's another factor. You have efforts behind the scenes where they were lying to East Iowa Plastics to steal away their products for purposes of trying to copy them. One of the key findings, I think, by the district court was that they waited to send the cease and desist letters until the trademark became uncontestable. That's just simply not true, is it? Well, Your Honor, no, I don't agree with that. And the reason I don't agree . . . You filed your lawsuit and challenged it. That's right. Timely. On the day before incontestability arrived. Okay, so the cease and desist letters had to come before that. Yes, they did. And I think one of the . . . So they were before, not after it became incontestable. So the district court was wrong, right? Well, in terms of when the cease and desist letters arrived, but if I may, there was a 2007 memo that involved Mr. Johnson that discusses the fact that in 2007 he was going to talk to the lawyer about enforcing PI's rights against AIP. There was no enforcement action taken then. There was no notice given to EIP. There was nothing. They sat on it. All right? The second thing is if you look at the pleadings by PI in this particular case, they allege in their pleading that the registrations were incontestable. That's in their counterclaim. So, you know, I'm sorry, but I think that that was their thinking, is that in fact the registrations were incontestable, that they had ownership rights based upon their use in commerce and based upon those registrations, and that they had ownership rights that were superior to East Iowa Plastics, and they were not. So, Your Honors, I think the reliance on the Hockenberg case, I think, is misplaced. Judge . . . the late Judge McManus relied upon the Van Sickle line of cases, and that's Williams versus Van Sickle it's talked about. But, essentially, that was the case where you had the county auditor who fabricated two letters and then tried to use those letters in trial. Well, if you look at it, in that case there was two letters fabricated. In our case, there was fabrication with regard to two trademark registrations. They each were used in evidence in each respective trial. The intent on the treasurer's part was to disprove, essentially, the fraudulent misrepresentation claim against her. The intent, in our case, was to disprove that the ADA transferred ownership rights to EIP of the trademark. Now, there was . . . you know, essentially, the oppressive . . . they found that to be oppressive and conniving. Now, there was a line of cases underneath the Van Slate case that I would like to cite, and some of them we didn't put in the brief. One is Klein versus Keystarts, 2002 Westlaw 681237. That was a case where . . . excuse me, I see my time is up. May I finish this line? I think it might be best if you just sent that in a 28-J letter, rather than reading it to us now. Okay. I will do that. Very well. All right. Your Honor, I appreciate the opportunity to speak with you. Thank you, and I would ask that the judge's ruling be affirmed. Thank you, Mr. Johnson. Thank you. Ms. Oxley, the Court ate into your rebuttal with some questions, so we'll give you two minutes, if you'd like, for rebuttal. To the extent that whether or not the prior panel's remand order extended to beyond state law, considering that two members of that prior panel, including the author, are here today, I think this Court probably is in the best position to decide the extent of that remand. Just a couple of things that I'd like to point out. PI admitted in the trial court that the declaration used to obtain its registration was inaccurate. It tried to explain why that happened, because the individuals at PI didn't understand and appreciate the relevance of EIP's use. They thought the ability to register depended on whether or not somebody else had it registered. To the extent that opposing counsel says that PI refused to ever even admit that its actions were improper, that's just incorrect. With respect to Judge Grunder's question about the incontestability standard, EIP's only response is to point to PI's pleadings, which of course have no relevance after we've had a trial and have actual facts. The district court's factual finding that part of PI's conniving scheme was to lay in wait for five years until its trademark became incontestable is simply wrong as a matter of fact. To the extent that EIP attempts to rely on the Williams line of cases, last May the Iowa Supreme Court reaffirmed in Thornton the difficult standard and threshold set by Hockenberg. Hockenberg very much controls this case. What about Van Sickle? Excuse me? What about Van Sickle? Doesn't that support an award? Is it? Does it support an award here? No, it does not. Van Sickle is the one with the county treasurer. The court in Van Sickle relied on the fact that the employee was a public servant who had created documents to paper its file, fraudulently created documents to paper the file, and then used those documents in the district court to not only defraud the other parties, but also to defraud the district court in an attempt to avoid personal liability for herself. It goes to those same line of cases that talks about a relationship, and in that case it was the fact that she was a public employee that I think turned the case in that case. Very well. Thank you, Your Honors.  We appreciate your arguments today and your briefing. The case is submitted and we'll decide it in due course.